STATE OF NEBRASKA, APPELLEE, v. GLORIA EVA OLIVA,
APPELLANT.
163 N. W. 2d 112

Filed December 13, 1968.   No. 36825.

A. Q. Wolf and Bennett G. Hornstein, for appellant.

Clarence. A. H. Meyer, Attorney General, and Ralph H. Gillan, for appellee.

Heard before SPENCER, BOSLAUGH, SMITH, McCOWN, and NEWTON, JJ., and STUART, District Judge.

NEWTON, J.

The defendant Gloria Eva Oliva was charged with and convicted of second degree murder in connection with the death of her uncle, Ralph Major. Defendant, her husband, and their children resided in the north portion of Omaha, Nebraska. Her uncle had lived with them off and on for 6 years. On the evening of January 10, 1967, defendant and her husband left the home. At the time, other persons present, in addition to the children, were Ralph Major and a family friend Alfred Oberle, Jr. The uncle was expected to stay and care for the children, but shortly thereafter he left the house carrying two sacks and Oberle stayed to look after the children. About midnight, or soon thereafter, defendant returned, looked around, and stated that her uncle had stolen her son's radio. She further said she was going to South Omaha to get the radio and again left the house.

Defendant and her husband stated they made rent collections in the area where they resided for their landlord and on such occasions defendant's husband carried a .22-caliber pistol. According to defendant, the pistol was loaded alternately with solid bullets and birdshot. On this evening, they took the gun because they were making some collections. Later in the evening, Mr. Oliva gave it and the money collected to defendant who put both in her purse before returning home. She had the gun and the money when she went to South Omaha, not having left these items at her home while there.

She caught a ride to South Omaha with an acquaintance and succeeded in locating her uncle at Marlow's Cafe about 2 a.m. on January 11. She called him out and as they walked up the street, she demanded the radio. He denied taking it and then admitted he had sold or pawned it. She demanded to know who had it. He refused to tell her and an argument ensued. She then shot him; he fell and she shot twice more; and she then walked away and caught a taxicab to her home. The first shot was heard and the last two witnessed by a man sitting in a parked car in front of the cafe. On the way home, she showed the gun to the taxicab driver and told him: "I just shot a guy over a hot radio," and "Here's the persuader I used to shoot the man with."

Police arrived at the scene almost immediately. Ralph Major was removed to the hospital but was dead on arrival. The autopsy report indicated death resulted from a gunshot wound in the chest. The bullet was recovered as was also some birdshot from other wounds. In Ralph Major's right shirt pocket, officers found a pocketknife with two blades open.

The police officers located defendant's home through the taxicab driver, knocked at the door, and were admitted by defendant. When asked if she knew Ralph Major, defendant said: "Yes, I shot him." She then got the pistol and showed it to the officers. It had one empty shell casing jammed in the cylinder but was

otherwise fully loaded. She informed the officers that she had reloaded the gun and thrown the expended shells outside. She also demonstrated how she had shot Ralph Major and said: "I shot the son of a bitch. I hope he dies." This testimony was not objected to.

Defendant, on arriving home, told Alfred Oberle, Jr., when asked if she got the radio: "No, I shot him." She was arrested and the officers drove her to the home of a woman who sometimes cared for defendant's children where defendant asked her to stay with the children and said: "I shot Ralph." When asked why, she said: "Well, he beat me up. * * * He knocked me down and was kicking me." The police version of this statement is that she simply said: "I have to have Gloria come over and babysit. They are taking me to jail. I just shot Ralph." After conveying the babysitter to defendant's home, two of the officers drove defendant to police headquarters. One officer testified that enroute, defendant stated: "I shot the son of a bitch, and I hope he dies." This was objected to for lack of foundation. One officer positively stated he did not ask her any questions and the other said he could not recall asking her any questions while in the car. This is not contradicted by defendant.

At the police station, a "Rights Advisory Form" was filled out. Defendant was booked and informed of the death of her uncle at which time she stated: "I killed the s.o.b. on his birthday, what do you know about that!" This testimony was not objected to.

At the police station, Sergeant Dragoun again informed defendant of her rights, filled out a second "Rights Advisory Form," and asked if she wanted to make a statement at that time. She said she wanted to make a telephone call and then called her husband informing him that she had shot Ralph. On refusing to make a statement, she said: "I will call an attorney," but she did not do so, was given a cup of coffee, and taken to a cell.

When defendant's husband arrived, defendant was again given the full Miranda warnings and asked if she

wished to make a statement. After talking with her husband, who was present at all times during the questioning, she specifically waived the presence of an attorney and agreed to give a statement. She then told of the events preceding and following the shooting and of the shooting itself substantially as above set forth. She did not refer to any of the statements alleged to have been made in the presence of the police at her home, at the babysitters, in the patrol car, or at the police station. Defendant stated she shot her uncle after he knocked her down and kicked her. On motion to suppress, the jury was excused and a hearing had at the conclusion of which the court found the statement was voluntary and overruled objections to it.

The defendant testified on the motion to suppress and before the jury. She denied ever receiving the Miranda warnings until after the statement was given. She admitted she never asked for a lawyer; that there was no force used; that her husband was present when she was questioned; and that she answered the questions pursuant to his advice. When asked if she answered voluntarily, she replied: "He asked the questions and I answered them." There is evidence to the effect that defendant had recently been in a mental institution due to excessive drinking. She stated, however, that she knew what she was doing on the morning of January 11, 1967, understood the nature and consequences of her acts, and knew right from wrong.

In her testimony, defendant stated she was 29 years of age and reiterated the occurrences of the night of January 10 and the following morning. She maintained that her uncle had struck and kicked her, had threatened her, and that he had taken the knife from his pocket. She conceded the statement given at the police station was correct except for the "Rights" matter, admitted she told Oberle and the babysitter she had shot her uncle, and that she reloaded the gun and showed it to the officers. She did not deny making the statements in her home,

in the patrol car, and at the police station which were attributed to her by the officers.

Defendant assigns as error the admission of the statement made in the police cruiser car enroute to the police station, the admission of the general statement taken at the police station, the admission of a photograph of the deceased, and the sustaining of an objection to evidence of the deceased's reputation for violence. We find these assignments to be without merit.

Defendant contends that the statement "I shot the son of a bitch, and I hope he dies," was admitted in violation of the rule of Jackson v. Denno, 378 U. S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908, in that the trial court did not specifically rule on its voluntariness. It may be pointed out that two other similar statements made at defendant's home and at the police station were admitted without objection. As to this particular question, defendant's objection of a lack of foundation was overruled. Defense counsel admitted that the police reports were very detailed and that he had repeated access to them prior to trial. He was aware of this item of evidence, but did not move to suppress it or request a hearing on its admissibility either before or during trial although his familiarity with this procedure was demonstrated by his use of such motion in regard to the complete statement taken from defendant.

Jackson v. Denno, supra, states: "Equally clear is the defendant's constitutional right at some stage in the proceedings to object to the use of the confession and to have a fair hearing and a reliable determination on the issue of voluntariness * * *." The defendant may request a hearing on and a determination of voluntariness, but in the absence of such request, defendant cannot complain of the failure of the court to hold such a hearing and make such determination. See, United States v. Frazier (6th Cir.), 385 F. 2d 901; Woody v. United States (D. C. Cir.), 379 F. 2d 130; People v. Payton, 82 Ill. App. 2d 51, 227 N. E. 2d 87. In the present case, defendant's

objection on the ground of a lack of foundation was properly overruled. A proper foundation had been established. The circumstances under which the statement had been made, and the fact it was voluntary had been shown and remain undisputed in the record. Had defendant wished to further challenge the voluntariness of the statement or desired a Jackson v. Denno hearing and determination on the issue, it was her privilege to ask for it or to move to suppress this evidence. Having done neither, she cannot now properly complain. "An objection to the admission of evidence cannot be considered by this court for some reason not properly and timely raised at the trial." Fugate v. State, 169 Neb. 420, 99 N. W. 2d 868.

Two police officers testified to the circumstances under which the remark was made. Their evidence shows that although defendant was then in custody, she was not being interrogated in any manner but volunteered the statement quoted above just as she had done earlier when she made the same indentical statement in her home prior to being taken into custody. This evidence is undisputed and defendant has not at any time testified to or produced evidence to the contrary.

Under such circumstances is Jackson v. Denno applicable? Jackson v. Denno and Miranda were both motivated by the court's desire to correct abuses found to exist as a result of *in-custody interrogation* of persons suspected of criminal activities. The object to be attained in both decisions was to insure the voluntariness of confessions admitted in evidence. Miranda specifically declares that it is not applicable to questioning during the investigatory stage nor to "volunteered statements of any kind." In Jackson v. Denno, *supra,* the court points out: "This is not a case where the facts concerning the circumstances surrounding the confession are undisputed and the task is only to judge the voluntariness of the confession based upon the clearly established facts * * *. Here there are substantial facts in dispute:

* * *." Here too, as in Miranda, the court clearly indicated its purpose was to prevent "* * * the use of involuntary confessions not only because of the probable unreliability of confessions that are obtained in a manner deemed coercive, but also because of the 'strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will,' * * *." Neither Jackson v. Denno nor Miranda contain the least hint that they were intended to apply to statements shown by the undisputed evidence to have been not only voluntary, but spontaneously made and *volunteered* in the complete absence of any interrogation, and which defendant does not deny were voluntary. There is not one scintilla of evidence presented, nor is it now urged, that defendant was threatened, coerced, or taken advantage of in any manner. It is obvious that defendant's counsel did not ask for a hearing on the question of the admissibility of this evidence because he realized the evidence was admissible. Now defendant seeks to take advantage of a situation brought about by her having elected not to press for a hearing. The pursuance of such tactics is neither to be rewarded nor approved.

Defendant asserted that the statement given at the police station was inadmissible because she had once indicated she would not answer questions and would call an attorney. She contended that she did not later adequately waive her right to have an attorney present when questioned. The circumstances do not bear her out. The evidence on the giving of the warning required in Miranda v. Arizona, 384 U. S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, 10 A. L. R. 3d 974, was conflicting but sufficient to sustain the trial court's determination of voluntariness following the separate hearing on the question. Defendant admitted she had access to the telephone, called her husband, who was with her throughout the questioning and advised her to answer, and that

she never asked for a lawyer. She does not deny answering the questions voluntarily. She admitted she was fully aware of what she was doing at the time and that no force was used.

Here there was no lengthy questioning or incarceration. She was not held incommunicado. No serious contention was made that she was subjected to promises, threats, intimidation, coercion, or physical abuse, or ill-treated in any manner nor is it seriously contended that defendant was of deficient mentality or unaware of the circumstances. Miranda requires only that a request for counsel be respected and interrogation cease. "* * * a request for counsel does not per se disable an accused from thereafter waiving counsel."

"* * * the Fifth Amendment does not say that a man shall not be permitted to incriminate himself, or that he shall not be persuaded to do so. It says no more than that a man shall not be 'compelled' to give evidence against himself." State v. McKnight, 52 N. J. 35, 243 A. 2d 240. See, also, Hill v. State (Tex. Crim.), 429 S. W. 2d 481; Jennings v. United States (5th Cir.), 391 F. 2d 512; State v. Godfrey, 182 Neb. 451, 155 N. W. 2d 438.

Objection is made to the admission of exhibit No. 14, a photograph of the body of Ralph Major, on the ground of insufficient identification. Officers Coyan and Bober went to the morgue together for the purpose of taking pictures of the body. Coyan took two pictures which were admitted in evidence, identified the subject as the body of Ralph Major, and stated that Bober then took other pictures. Bober stated he then took exhibit No. 14 with the same camera, but was not, at the time he took the picture, aware of whose body it was. It is a reasonable inference that they photographed the same body, but in any event, we find nothing of a prejudicial nature in regard to this picture.

Defendant's final objection is that the court sustained an objection when Gloria Jean Dreifurst was questioned regarding the reputation of Ralph Major for violence.

She stated she had known Ralph Major for a couple of years, but did not indicate the nature or extent of her acquaintance with him. She was not asked and did not state that she knew his general reputation in the community for violence. Clearly a proper foundation for the question was not laid and no error occurred.

The judgment of the trial court is correct and is affirmed.

AFFIRMED.

BOSLAUGH and McCOWN, JJ., concurring in result.