STATE OF NORTH CAROLINA v. WILLIE B. WILLIAMS

No. 41

(Filed 12 June 1970)

1. **Criminal Law §§ 75, 76— voluntariness of confession — failure of defendant to object — duty of court**

   In the absence of an objection by the defendant, the trial court is not required *sua sponte* to conduct a *voir dire* into the voluntariness of defendant's confession, unless there is indication that the confession was anything less than voluntary.

2. **Criminal Law § 76— voluntariness of confession — burden of proof**

   The burden of showing the voluntariness of a confession is now upon the State.

3. **Criminal Law § 61— tire tracks — competency of evidence**

   It was competent for an officer to testify that the tire tracks discovered at the scene of a homicide were compared with the tires on the automobile driven by defendant and that the tread on both tracks and tires was the same.

4. **Criminal Law § 34— testimony that defendant was on work release — competency — identity of defendant**

   Testimony in a homicide prosecution that the defendant was on "work release" the day the crime was committed was competent as proof of the identity of defendant and as a fact in the chain of events leading up to the commission of the crime.

5. **Criminal Law § 102— argument of solicitor — return of death penalty by jury**

   In a first-degree murder prosecution, it was permissible for the solicitor to argue that in view of the brutality of defendant's conduct in the killing of his victim, a bride of nine days, the jury should find the defendant guilty of murder in the first degree without any recommendation that punishment be life imprisonment. G.S. 15-176.1.

6. **Criminal Law § 102— argument of counsel — discretion of court**

   In this jurisdiction wide latitude is given to counsel in the argument of contested cases; what constitutes an abuse of this privilege must ordinarily be left to the sound discretion of the trial judge.

7. **Criminal Law § 102— argument in capital cases — prejudicial effect — time of exception**

   The general rule that exceptions to improper remarks of counsel during argument must be taken before verdict or else be lost does not apply to death cases where the remarks are so prejudicial to defendant that their effect cannot be removed from the jurors' minds by any instruction the trial judge might give.

   BOBBITT, C.J., and SHARP, J., dissenting as to death sentence.

APPEAL by defendant from *Braswell, J.,* at the April 21, 1969 Criminal Session, Superior Court of BLADEN County.

Defendant appeals from a judgment sentencing him to death, the jury having found him guilty of murder in the first degree and having made no recommendation that his punishment be imprisonment for life. The indictment, verdict, and judgment were all in proper form.

Prior to the trial, because of defendant's behavior, his privately employed counsel, Harold D. Downing, moved that the defendant be committed to State Hospital at Raleigh for observation and examination pursuant to the provisions of G.S. 122-91. This was done, and on 12 March 1969 the hospital submitted its report and recommendations as follows:

> "*Diagnosis:* Without Psychosis (Not Insane).
>
> APA Code: *91.10*
>
> "*Recommendations:* Examination, observation and testing revealed no evidence of insanity or any other mental disturbance that might interfere with his ability to plead to the bill of indictment. Mr. Williams can distinguish between right and wrong, he understands the nature and consequences of his criminal charges and he is able to assist in his own defense. This patient should return to court as being competent to stand trial."

When the case was called for trial on the morning of 22 April 1969, the defendant at first refused to come into the courtroom but remained in his cell wrapped in a blanket, apparently nude. The court then requested that Dr. O. A. Barnhill, a practicing physician in Elizabethtown, examine the defendant. Dr. Barnhill did so and reported to the court that he had not elicited anything from the defendant that would lead him to believe that he was insane. At the opening of court that afternoon, the defendant came into court fully and neatly clothed, apparently in possession of his faculties, and the scene was completely calm. Counsel for the defendant participated in the selection of the jury. However, after the jury was selected, the defendant announced that he did not want Downing or any other lawyer to represent him, that he understood the charges against him and understood his rights, but he did not want the court to appoint a lawyer for him and this decision was his own free choice. Whereupon, the court announced:

> "Then, Mr. Williams, I would say to you and to Mr. Downing, since the law of North Carolina provides for a defendant

charged with murder in the first degree to have counsel, I will require Mr. Downing to be available at court during the course of your trial; to be available for consultation with you if you want him; to be available where you can talk to him about any of the legal technicalities which may come up if you want to talk to him; to be available to answer questions to you if you want to ask him questions; and to be available to examine and cross-examine any witnesses if you should choose at any time that you want him to examine or cross-examine any witnesses. He will not be required to directly participate in the trial unless you at some stage or at any stage of the trial shall change your mind, and decide you want him to help you. If you at any time should decide you want him to help you, he will be immediately available and by your side to help you. He will not be giving you advice during the course of the trial unless you shall ask him for it. Do you have any questions you want to ask me concerning what I have just said to you and to him?"

The defendant answered that he had no questions and no objections to Mr. Downing being with him.

The trial then proceeded and the State offered evidence tending to show: The victim, Mary Diane Johnson Smith, a bride of nine days, lived with her husband in a house trailer on a rural road off Highway #210 in Bladen County. She returned home from work about 4:45 p.m. on 7 October 1968. When the deceased's husband returned from work about 6:30 p.m. his wife was not at home; his razor, a class ring, a pair of trousers, a pair of shoes, and a small train case containing $360 were missing from the trailer. A sixteen-gauge shotgun was standing unloaded in the corner although it had been loaded when the husband left for work that morning.

At approximately 7:30 p.m. Deputy Sheriff King went to the Smith trailer and, with the aid of another deputy and other people, made an examination of the trailer and a search of the immediate surrounding area. The body of the deceased, clad in underclothes and a shirt, was found in the bottom of a shallow drainage ditch in a field across the road from the trailer. There was a hole in the back of her head approximately one inch in diameter and another hole in the left temple a little larger than the one in the back of her head.

Deputy King observed automobile tracks in the vicinity leading to a spot of blood which covered an area of about two and one-half feet. The tracks then led to a soybean field and circled back by the blood spot. The deputy poured a cast of the tire prints for identi-

fication purposes. A pair of safety boots was also found in the drainage ditch about thirty feet east of the body of the deceased.

On the morning of 9 October 1968, in response to a call from authorities in Fayetteville, Sheriff Allen and Deputy King of Bladen County and two other officers went to Fayetteville and received custody of the defendant and a 1967 white Chevrolet automobile. The automobile had four practically new tires bearing the marking "Pure Pride" on the sidewall. This same marking was present in the tracks found by Deputy King in the soybean field. The automobile was examined, and soybean plants and soil were removed from the chassis of the automobile. The soil and soybeans taken from the car were compared with samples taken from the soybean field where the body was discovered, and the samples were found by a chemist with the State Bureau of Investigation to be of the same type.

At approximately 9 a.m. on 9 October 1968 Deputy King and Agent Bryan of the State Bureau of Investigation began interrogation of the defendant. They advised him fully of his constitutional rights, and the defendant then made a statement to the officers in substance as follows: On the morning of 7 October 1968 he got a drink of liquor in Wilmington; he saw the keys in the 1967 Chevrolet automobile and took the automobile intending to go to Fayetteville; on the way he stopped at a house and took a camera, some jewelry, and a tape machine and then went to a second house where he got a shotgun, a rifle and some gun shells; he got lost, pulled off the highway and slept awhile. When he awoke he drank some more liquor and continued on to Fayetteville. He passed a trailer, saw the door open, and decided to go in and get some more clothes; he found Mrs. Smith in the trailer and held the gun on her while he was there, telling her she would not be harmed if she did as he said. He ate some food, took several items from the trailer including a train case containing $360 and other articles, and then ordered Mrs. Smith to leave with him in the automobile. He forced her to take off her trousers which he said was for the purpose of searching for money. When she refused to get into the car and began to run and holler, he shot her. He put the body in a drainage ditch where he also disposed of his boots. Then he got into the car and drove across the soybean field until he could go no farther; there he turned around and returned to the road. Later, he stopped the car somewhere near Fayetteville and disposed of the clothes, guns, and other items he had taken and then drove on to Fayetteville where he spent the night.

The next day the defendant took the officers to the place in the

woods where he had disposed of the articles taken from the houses and the trailer, and they recovered the train case belonging to the deceased with approximately $360 in it, a shotgun, a rifle, and several other items.

During the course of the trial defendant did not cross-examine the State's witnesses nor did he offer witnesses or testify in his own behalf, and at the close of the evidence he stated he did not want to make a speech to the jury and that he did not want Attorney Downing to do so.

At the close of all the testimony, the court called Dr. Andrew L. Laczko who testified in the absence of the jury that he examined the defendant at the State Hospital at Raleigh while the defendant was under his direction, care, and responsibility from 7 February 1969 until 13 March 1969; and as a result of a request from the court he had attended the trial and observed the defendant; he attempted to talk to the defendant but defendant refused to talk to him; he had not during his attendance at the trial, or in observing the defendant, seen or observed anything to cause him to form an opinion different from that previously expressed as to whether or not he now has a psychosis.

After the jury returned its verdict and the court imposed the death sentence, the defendant stated he did not want to appeal. However, his attorney moved for a new trial, which motion was overruled. The attorney then gave notice of appeal and, on a finding by the court that the defendant was an indigent, he was permitted to appeal without giving security for costs.

*Attorney General Robert Morgan and Deputy Attorney General Ralph Moody for the State.*

*Downing, Downing & David by Harold D. Downing for defendant appellant.*

MOORE, J.

Despite the fact that defendant did not want to appeal, his attorney filed a brief posing four questions for decision.

[1]    Defendant contends first that the trial court erred when it admitted defendant's confession and other evidence obtained as a result thereof without first inquiring into its voluntariness. Defendant did not object to this testimony, so the real question is: should the trial court in the absence of an objection inquire *sua sponte* into the voluntariness of an alleged confession offered by the State? We

think not. The general rule is stated in 29 Am. Jur. 2d Evidence § 583 as follows:

> "While there is some authority to the effect that it is the duty of the trial court, in the absence of objections by the defendant, to conduct an inquiry into the admissibility of a confession, it is more generally held that a defendant in a criminal case who objects to the introduction in evidence of a confession by him, on the ground that it was involuntary, should make a timely offer of evidence showing the incompetency of the confession, or should request that a preliminary investigation of the matter be made, which offer or request should be made before the court rules on the evidence offered. *Where no proper and timely objection to the voluntariness of a confession is made, or no request is made for an examination as to its voluntariness, no preliminary examination or hearing is required with respect to such question, and the defendant cannot, upon an appeal, raise the issue that the court erred in failing to conduct such a preliminary examination.*" (Emphasis ours.)

In *State v. Vickers*, 274 N.C. 311, 163 S.E. 2d 481, Branch, J., carefully reviewed the authorities concerning the admission of confessions, reaffirming the long-established rule in North Carolina that admissions or confessions to the police officer would not be rendered incompetent solely because defendant was under arrest when they were made, and that an extrajudicial confession is admissible against a defendant when and only when it was voluntarily and understandingly made. In *Vickers* the Court held that a general objection to testimony concerning an alleged confession was sufficient to require a *voir dire* to determine its voluntariness, saying:

> "For a long period of time North Carolina has remained squarely within the rule that a confession is presumed to be voluntary until the contrary appears (*State v. Mays*, 225 N.C. 486, 35 S.E. 2d 494; *State v. Rogers, supra* [233 N.C. 390, 64 S.E. 2d 572]; *State v. Stubbs, supra* [266 N.C. 274, 145 S.E. 2d 896]), and that when a confession is offered into evidence the burden is on defendant to show the contrary. *State v. Hamer, supra* [240 N.C. 85, 81 S.E. 2d 193]; *State v. Biggs*, 224 N.C. 23, 29 S.E. 2d 121; *State v. Stubbs, supra* [266 N.C. 274, 145 S.E. 2d 896]. However, it becomes evident from the authorities herein cited that when an alleged confession *is challenged by objection* the necessity for a voir dire hearing in the absence of the jury is no longer controlled by these principles.

"See 3 Wigmore, 3d Ed., § 860, 1964 Pocket Supplement, for full note and cites as to modern trend in other jurisdictions.

"We hold that hereafter when the State offers a confession in a criminal trial *and the defendant objects,* the trial judge shall determine the voluntariness of the admissions or confession by a preliminary inquiry in the absence of the jury." (Emphasis ours.)

[2] It is no longer the rule that a confession is presumed to be voluntary and the burden is on a defendant to show the contrary. The burden of showing the voluntariness of a confession is now upon the State. *State v. Thorpe,* 274 N.C. 457, 164 S.E. 2d 171, *State v. Vickers, supra.*

In both *Vickers* and *Thorpe* objections were made to the introduction of the testimony concerning the alleged confessions. This Court has generally held that there is no necessity for a *voir dire* when there is no objection to the proffered testimony. *State v. Stubbs,* 266 N.C. 274, 145 S.E. 2d 896; *State v. Camp,* 266 N.C. 626, 146 S.E. 2d 643. Due to "peculiar" circumstances, this rule was relaxed to some extent in *State v. Pearce,* 266 N.C. 234, 237, 145 S.E. 2d 918, 921. There, speaking for the Court, Higgins, J., said:

"By reason of the Superior Court's failure for two months to appoint counsel as it was its duty to do promptly, the prisoner was deprived of the protection from the pressure of questioning which an alert attorney could have vouchsafed him. In the absence of such protection at a time when he was under a charge which could cost his life, the officers continued their questioning which obviously was for the sole purpose of extracting damaging admissions. The defendant was in the county jail under Superior Court indictment. Nevertheless, the admission testified to by Mr. Morris was obtained in the interrogation room of the detective bureau where perhaps the surroundings were even less reassuring than his cell in the county jail. We hold the admissions to the officer finally obtained from him in this setting were so lacking in voluntary character as to make them inadmissible as evidence against him. True, the record fails to show objection to the officer's testimony. However, the court, of its own motion, should have excluded the statement as involuntary. Under the peculiar circumstances here disclosed, we hold the court's failure so to do was prejudicial error."

[1] The instant case can be clearly distinguished from *Pearce.* The error there was the continuation of the interrogation over a period

of two months while the defendant was in custody on a capital charge without benefit of counsel. Here the defendant made his statement to the officer the day after the crime was committed after having been fully advised by the officer of his constitutional rights; namely, he had a right to be silent; anything he said could be used against him in court; he had a right to talk to the lawyer for advice before he was asked any questions and to have him with him during the questioning; if he could not afford a lawyer, one would be appointed for him before he was questioned if he so wished; and if he decided to answer questions without a lawyer being present, he had the right to stop answering questions at any time. He stated he understood his rights, and then made his statement to the officer. There is nothing in this record to indicate that the confession was anything less than voluntary, and we hold that in the absence of such indication no *voir dire* is necessary unless there is an objection to the testimony concerning the alleged confession. *State v. Painter,* 265 N.C. 277, 144 S.E. 2d 6.

In *United States v. Inman,* 352 F. 2d 954 (4th Cir. 1965), the Circuit Court of Appeals for the Fourth Circuit seemed to take the opposite view when it said:

". . . On proffer of the confession, even though there be no objection, the court should let the jury withdraw, and then take evidence upon the confession and its factual setting. On this voir dire the defendant may testify without prejudice to his privilege not to take the stand before the jury, but he may be examined or cross-examined only with regard to the origin and character of the confession, not upon his innocence or guilt. The court will thereupon independently determine whether the confession is admissible."

However, the same Court in *Morris v. Boles,* 386 F. 2d 395 (4th Cir. 1967), cert. den. 390 U.S. 1043, 88 S. Ct. 1640, 20 L. ed. 2d 304 (1968), later acknowledged that what was said in *Inman* did not prescribe a rule of constitutional application to prosecutions in state courts within the Circuit, but was based on the court's supervisory power over district courts within the Circuit. In a more recent opinion written by Judge Burger (now Chief Justice) the Court of Appeals for the District of Columbia chose specifically not to follow the *Inman* decision. In *Woody v. United States,* 379 F. 2d 130 (D.C. Cir. 1967), cert. den. 389 U.S. 961, 88 S. Ct. 342, 19 L. ed. 2d 371 (1967), Judge Burger said:

"There is dictum in *United States v. Inman* that the trial judge should *sua sponte* order a hearing on the voluntariness of

a confession and, if he finds it voluntary, instruct the jury with respect to their role in deciding on the use of the confession. Even assuming we were disposed to follow the dictum in *Inman,* which we elect not to do, it should be noted that it has no application to a situation such as existed here. Not only did appellant fail to make objection to use of the statements, but he also denied making them.

\*          \*          \*

"We do not rest solely on the futility of remand. Appellant never contested the voluntariness of the statements and never asked for a hearing on voluntariness; we see no basis for a remand to afford him an opportunity to make a claim he has heretofore eschewed."

*Woody* has been approved in *State v. Olivia,* 183 Neb. 620, 163 N.W. 2d 112 (1968), cert. den. 395 U.S. 925, 89 S. Ct. 1780, 23 L. ed. 2d 242 (1969), and in *State v. Armstrong,* 103 Ariz. 280, 440 P. 2d 307 (1968). We think this is the correct rule, and this assignment of error is overruled.

[3]    Defendant next assigns as error the admission of testimony by Deputy Sheriff King concerning the comparison of tire tracks found at the scene of the crime with the tires on the car which the defendant admitted he was driving. A plaster cast was made of the tire marks at the scene and compared with the tires on the 1967 Chevrolet which defendant was using. The car was equipped with four tires bearing the trademark of "Pure Pride." The witness, without objection, said the tread on the plaster cast was compared with the tires and found to be the same. This was simply a statement of fact derived from observation of facts presented to him, and we think it is competent. *State v. Moore,* 276 N.C. 142, 171 S.E. 2d 453; *State v. Leak,* 156 N.C. 643, 72 S.E. 567. Stansbury, N. C. Evidence § 129 (2d ed. 1963).

[4]    Next defendant contends the court erred in allowing the testimony to the effect that the defendant was on "work release" the day the alleged crime was committed. The defendant himself made that statement to the officer, and the officer, without objection, simply repeated what defendant told him. The term "work release" does not relate to any specific crime or the degree or nature of any crime. While it is undoubtedly the rule of law that evidence of a distinct substantive offense is inadmissible to prove another independent crime, this rule is subject to well-established exceptions where the two crimes are disconnected and not related to each other. Proof of the commission of other like offenses to show a chain of circumstan-

tial evidence with respect to the matter on trial or to show the identity of the person charged is competent. *State v. Christopher,* 258 N.C. 249, 128 S.E. 2d 667; *State v. Summerlin,* 232 N.C. 333, 60 S.E. 2d 322; *State v. Dail,* 191 N.C. 231, 131 S.E. 573; *State v. Simons,* 178 N.C. 679, 100 S.E. 239; *State v. Weaver,* 104 N.C. 758, 10 S.E. 486. The testimony that defendant was on "work release" was competent as proof of the identity of defendant and as a fact in the chain of events leading up to the commission of the alleged crime.

**[5]** The final question posed by the brief filed in behalf of defendant is: "Were the solicitor's remarks in his argument to the jury so prejudicial as to constitute reversible error?" We think not. The solicitor reviewed the evidence and argued with great zeal that in view of the brutality of defendant's conduct in connection with the killing of Mary Diane Johnson Smith that the punishment therefor should be death and that the jury should find the defendant guilty of murder in the first degree without any recommendation that punishment should be life imprisonment. Prior to 1961 such argument would have been prejudicial error. *State v. Pugh,* 250 N.C. 278, 108 S.E. 2d 649. The General Assembly changed this rule by the enactment of G.S. 15-176.1 in 1961, which must now be construed with G.S. 14-17. G.S. 14-17 reads in pertinent part: "A murder . . . which shall be committed in perpetration or attempt to perpetrate any arson, rape, robbery, burglary or other felony, shall be deemed to be murder in the first degree and shall be punished with death: Provided, if at the time of rendering its verdict in open court, the jury shall so recommend, the punishment shall be imprisonment for life in the State's prison, and the court shall so instruct the jury." G.S. 15-176.1 provides: "In the trial of capital cases, the solicitor or other counsel appearing for the State may argue to the jury that a sentence of death should be imposed and that the jury should not recommend life imprisonment."

**[6, 7]** In this jurisdiction wide latitude is given to counsel in the argument of contested cases. Moreover, what constitutes an abuse of this privilege must ordinarily be left to the sound discretion of the trial judge. *State v. Bowen,* 230 N.C. 710, 55 S.E. 2d 466; *State v. Christopher, supra.* However, it is the duty of the judge to interfere when the remarks of counsel are not warranted by the evidence and are calculated to mislead or prejudice the jury, the argument and conduct of counsel being largely in the control and discretion of the presiding judge. *State v. Correll,* 229 N.C. 640, 50 S.E. 2d 717. Ordinarily, exceptions to improper remarks of counsel during argument must be taken before verdict. *State v. Hawley,* 229 N.C. 167, 48 S.E. 2d 35; *State v. Tyson,* 133 N.C. 692, 45 S.E. 838. Such excep-

tions, like those to the admission of incompetent evidence, must be made in apt time or else be lost. This general rule has been modified in recent years so that it does not apply to death cases where the argument of counsel is so prejudicial to defendant that in this Court's opinion it is doubted that the prejudicial effect of such argument could have been removed from the jurors' minds by any instruction the trial judge might have given. *State v. Miller,* 271 N.C. 646, 157 S.E. 2d 335; *State v. Dockery,* 238 N.C. 222, 77 S.E. 2d 664.

**[5]** In the instant case, no objections were made to the solicitor's remarks, but after a careful review we hold that in view of the evidence in this case and the provisions of G.S. 15-176.1 the argument made by the solicitor was permissible. *State v. Christopher, supra.* This assignment of error is overruled.

This case has caused this Court grave concern because of defendant's refusal to accept assistance of counsel or to authorize an appeal so this Court might review his trial for possible errors. This strange and puzzling behavior of defendant under circumstances involving his life or death has caused us to meticulously review the entire record.

The able trial judge, consonant with the highest tradition of our judiciary, fully advised defendant of his rights and painstakingly sought to protect those rights throughout every step and phase of the trial.

In the trial we find no error of law which would justify us in granting defendant a new trial or in vacating or modifying the judgment.

No error.

BOBBITT, C.J., and SHARP, J., dissenting as to death sentence.

We vote to vacate the judgment imposing the death sentence. In our opinion, the verdict of guilty of murder in the first degree should be upheld and the cause remanded for pronouncement of a judgment imposing a sentence of life imprisonment.

The crime was committed on October 7, 1968, when our statutes relating to capital punishment for murder in the first degree were G.S. 14-17 and G.S. 15-162.1. It was and is our opinion that, until the repeal of G.S. 15-162.1 on March 25, 1969, the decisions of the Supreme Court of the United States in *United States v. Jackson,* 390 U.S. 570, 20 L. ed. 2d 138, 88 S. Ct. 1209 (1968), and in *Pope v. United States,* 392 U.S. 651, 20 L. ed. 2d 1317, 88 S. Ct. 2145 (1968), rendered invalid the death penalty provisions of G.S. 14-17. The

reasons underlying our opinion have been stated fully in the dissenting opinions in *State v. Spence,* 274 N.C. 536, 164 S.E. 2d 593, and in *State v. Atkinson,* 275 N.C. 288, 167 S.E. 2d 241, and in *State v. Hill,* 276 N.C. 1, 170 S.E. 2d 885 (1969). See also our dissenting opinion in *State v. Roseboro,* 276 N.C. 185, 171 S.E. 2d 886, and in *State v. Sanders, ante,* 598, 174 S.E. 2d 487. Repetition is unnecessary.

G.S. 15-162.1 was repealed by Chapter 117, Session Laws of 1969. The 1969 Act, if construed to provide greater punishment for murder in the first degree than the punishment provided therefor when the crime was committed, would, in that respect, be unconstitutional as *ex post facto.* 16 Am. Jur. 2d Constitutional Law § 396. In our view, if the death penalty provisions of G.S. 14-17 were invalid on October 7, 1968, when the crime was committed, they were invalid as to this defendant in April, 1969, when he was tried, convicted and sentenced.